**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**

Sarah McQuaid

    v.                                                    Case No. 15-cv-08-SM
                                                              Opinion No. 2015 DNH 203
Carolyn W. Colvin, Acting
Commissioner, Social
Security Administration


**O R D E R**


    Pursuant to 42 U.S.C. § 405(g), Sarah McQuaid moves to
reverse the Acting Commissioner's decision to deny her
applications for Social Security disability insurance benefits,
or DIB, under Title II of the Social Security Act, 42 U.S.C. §
423, and for supplemental security income, or SSI, under Title
XVI, 42 U.S.C. § 1382.  The Acting Commissioner, in turn, moves
for an order affirming her decision.  For the reasons that
follow, this matter is remanded to the Acting Commissioner for
further proceedings consistent with this order.

## I. Standard of Review

    The applicable standard of review in this case provides, in
pertinent part:

> The [district] court shall have power to enter, upon
> the pleadings and transcript of the record, a judgment
> affirming, modifying, or reversing the decision of the
> Commissioner of Social Security, with or without
> remanding the cause for a rehearing.  The findings of
> the Commissioner of Social Security as to any fact, if

> supported by substantial evidence, shall be conclusive
> . . . .

42 U.S.C. § 405(g) (setting out the standard of review for DIB decisions); see also 42 U.S.C. § 1383(c)(3) (establishing § 405(g) as the standard of review for SSI decisions).  However, the court "must uphold a denial of social security . . . benefits unless 'the [Acting Commissioner] has committed a legal or factual error in evaluating a particular claim.'"  Manso-Pizarro v. Sec'y of HHS, 76 F.3d 15, 16 (1st Cir. 1996) (per curiam) (quoting Sullivan v. Hudson, 490 U.S. 877, 885 (1989)).

As for the statutory requirement that the Acting Commissioner's findings of fact be supported by substantial evidence, "[t]he substantial evidence test applies not only to findings of basic evidentiary facts, but also to inferences and conclusions drawn from such facts."  Alexandrou v. Sullivan, 764 F. Supp. 916, 917-18 (S.D.N.Y. 1991) (citing Levine v. Gardner, 360 F.2d 727, 730 (2d Cir. 1966)).  In turn, "[s]ubstantial evidence is 'more than [a] mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  Currier v. Sec'y of HEW, 612 F.2d 594, 597 (1st Cir. 1980) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)).  But, "[i]t is the responsibility of the [Acting Commissioner] to determine issues of credibility and to draw inferences from the record evidence.  Indeed, the

resolution of conflicts in the evidence is for the [Acting Commissioner], not the courts." Irlanda Ortiz v. Sec'y of HHS, 955 F.2d 765, 769 (1st Cir. 1991) (per curiam) (citations omitted).  Moreover, the court "must uphold the [Acting Commissioner's] conclusion, even if the record arguably could justify a different conclusion, so long as it is supported by substantial evidence." Tsarelka v. Sec'y of HHS, 842 F.2d 529, 535 (1st Cir. 1988) (per curiam).  Finally, when determining whether a decision of the Acting Commissioner is supported by substantial evidence, the court must "review[] the evidence in the record as a whole." Irlanda Ortiz, 955 F.2d at 769 (quoting Rodriguez v. Sec'y of HHS, 647 F.2d 218, 222 (1st Cir. 1981)).

## II. Background

The parties have submitted a Joint Statement of Material Facts, document no. 8.  That statement is part of the court's record and will be summarized here, rather than repeated in full.

McQuaid has been diagnosed with anxiety and has been treated for both anxiety and depression.  For those conditions, her primary care physician, Dr. Melissa Hanrahan, has prescribed

Paxil,[1] Celexa,[2] Valium,[3] Klonopin,[4] Prozac,[5] Xanax,[6] Abilify,[7] Trazadone,[8] Wellbutrin,[9] and Amitriptyline.[10]  McQuaid was diagnosed with abdominal pain in December of 2009.  See Administrative Transcript (hereinafter "Tr.") 283.  In 2010, she applied for disability insurance benefits and supplemental security income

As a result of her application, McQuaid was seen by Dr.

---

[1] Paxil is used to treat depression, anxiety, and panic disorder.  See Dorland's Illustrated Medical Encyclopedia (32nd ed. 2012) 1384, 1399.

[2] Celexa is an antidepressant.  See Dorland's, supra note 1, at 312, 366.

[3] Valium is a "trademark for preparations of diazepam." Dorland's, supra note 1, at 2020.  Diazepam is an anti-anxiety agent.  See id. at 512.

[4] Klonopin is used to treat panic disorders.  See Dorland's, supra note 1, at 373, 989.

[5] Prozac is used to treat depression.  See Dorland's, supra note 1, at 722, 1539.

[6] Xanax is an anti-anxiety agent.  See Dorland's, supra note 1, at 54, 2085.

[7] Abilify is an antipsychotic.  See Dorland's, supra note 1, at 3, 132.

[8] Trazadone hydrochloride is an antidepressant.  See Dorland's, supra note 1, at 1957.

[9] Wellbutrin is an antidepressant.  See Dorland's, supra note 1, at 261, 2079.

[10] Amitriptyline hydrochloride is an antidepressant.  See Dorland's, supra note 1, at 63.

Rexford Burnette for a consultative psychological examination. He prepared a Mental Health Evaluation Report in which he made diagnoses of major depressive disorder, anxiety disorder, alcohol abuse in sustained full remission, and cannabis abuse in sustained full remission. As a part of his mental status examination, Dr. Burnette made the following observation concerning McQuaid's mood:

> This claimant was moderately anxious during this session but her depressive symptoms were not overtly apparent (and she acknowledges that her Prozac prescription has been very helpful in managing her depression).

Tr. 345.

When asked to give an opinion on McQuaid's abilities to perform activities of daily living, Dr. Burnette referred to a description of her present daily activities that includes the following:

> She spends most of her time at home and dreads going anywhere.  She does drive but tries to avoid it whenever possible.  . . .  She occasionally attends appointments with her PCP.  She drove to this session unaccompanied but said she only tried it because it is so close to her home and she knew the area well.  . . .  She rarely shops and prefers to be accompanied whenever she does.  . . .  This claimant performs housework and food preparation, and she attends to her hygiene and grooming appropriately.

Tr. 346.  When asked for his opinion on McQuaid's abilities in the area of social functioning, Dr. Burnette stated, in part:

> This claimant has few social contacts.  . . .  She has

5

> a routine therapeutic relationship with her PCP which
> is apparently long-standing.  She has few, if any,
> friends and attends no social or religious activities.
> She was able to establish effective interpersonal
> rapport with this examiner and she expressed her
> thoughts and feelings well, but she remained anxious
> throughout the session.  Last year . . . she had
> worked for "a month or so" as a waitress . . . leaving
> because of "the driving" and "dealing with the people"
> . . . .  She said that she was always well-liked in
> her job but she felt increasingly anxious and unable
> to deal with people and the public.

Tr. 347.  When asked for his opinion on McQuaid's abilities to

understand and remember instructions, Dr. Burnette stated that

those abilities were "[n]ot significantly limited at this time."

Id.  When asked for his opinion on McQuaid's abilities in the

areas of concentration and task completion, Dr. Burnette wrote:

"Ms. McQuaid describes persistent and generalized anxiety

throughout the day.  This anxiety reportedly interferes with her

ability to focus on tasks and complete complex projects."  Id.

When asked for his opinion on McQuaid's abilities in the areas

of reacting to stress and adapting to work or work-like

situations, Dr. Burnette wrote:

> In her last job, this claimant's growing anxiety about
> dealing with people and the public was a major
> contributor to her leaving her profession as a
> waitress.  However, she apparently performed her job
> effectively for years.

Tr. 348.  Finally, Dr. Burnette made the following prognosis:

> Ms. McQuaid is compliant with her prescription
> psychiatric medications.  She did not express any
> particular interest in engaging in formal

psychological counseling – partly related to her
anxiety about driving to sessions and establishing a
therapeutic relationship.  However, competent mental
health treatment may help ameliorate her anxiety
symptoms more effectively than expecting her PCP to
manage these with medications alone.  At the very
least a psychiatric consultation is suggested.

Id.

Based upon Dr. Burnette's evaluation, Dr. Edward Martin

completed a Psychiatric Review Technique form on McQuaid.  With

regard to McQuaid's functional limitations, Dr. Martin opined

that McQuaid had: (1) mild restriction on her activities of

daily living; (2) mild difficulties in maintaining social

functioning; (3) mild difficulties in maintaining concentration,

persistence, and pace; and (4) no episodes of decompensation

each of extended duration.  Based upon that, he reached the

following conclusion:

Dr. Burnette opines that, despite any impairments, Ms
McQuaid is able to care for herself adequately if
required to do so, to interact effectively and
appropriately with others despite some discomfort, to
maintain concentration/persistence/pace, and to
otherwise tolerate the stresses common to work or
work-like situations.  Thus, Impairments Not Severe is
an appropriate conclusion.

Tr. 361.

With respect to McQuaid's physical conditions, Dr. Jonathan

Jaffe opined, in August of 2010, that McQuaid's abdominal pain

was not a severe impairment.  About six months later, McQuaid

was diagnosed with "arthritic changes in her right thumb."  Tr.

7

370.

In a letter addressed to McQuaid's attorney that post-dated Dr. Martin's opinion on McQuaid's mental condition, Dr. Hanrahan stated:

> [McQuaid] has been my patient since 2003 and has been unable to work since approximately March of 2009.  She has suffered with severe disabling anxiety and depression.  I have seen her struggle with trying to work and trying to cope with the anxiety and panic attacks.  She would get physical symptoms such as vomiting and headaches from the anxiety.  We have tried many medications over the years some help calm the anxiety but nothing has relieved it.  She has a hard time leaving the house due to her anxiety.  She did work for many years as a waitress but []as anxiety got worse she found this harder and harder to do.

Tr. 364.  Dr. Hanrahan's statement concerning the general ineffectiveness of medication is supported by statements in her treatment notes.[11]

About a month after she sent the letter quoted above, Dr. Hanrahan also completed a Medical Source Statement in which she opined that McQuaid was unable to work at all and would be absent from work due to her impairments for more than four days per month.  With regard to McQuaid's functional limitations, Dr. Hanrahan opined that McQuaid had: (1) marked restriction on her

---

[11] Those statements include: (1) on April 11, 2008: "has had poor response to SSRIs [selective serotonin reuptake inhibitors] in the past," Tr. 302; (2) on June 24, 2009: "valium and ativan not much help," Tr. 289; and (3) on December 21, 2009: "in the past she has been fairly nonresponsive to SSRIs," Tr. 288.

activities of daily living; (2) marked difficulties in maintaining social functioning; (3) marked difficulties in maintaining concentration, persistence, and pace; and (4) four or more episodes of decompensation, within a 12-month period, each lasting at least two weeks.  Those opinions are supported by impressions in Dr. Hanrahan's treatment records that both pre- and post-date her Medical Source Statement.[12]

McQuaid's application was denied at the initial level. Thereafter, she received a hearing before an Administrative Law Judge ("ALJ"), who ruled that she was not disabled because she did not have a severe impairment, as that term is defined in the applicable Social Security regulations.  See Tr. 72.  Upon review, the Appeals Council vacated the ALJ's decision and remanded the case for further proceedings.  See id. at 80.

In its remand order, the Appeals Council noted that the ALJ: (1) failed to evaluate McQuaid's hand pain and arthritic changes; (2) did not discuss or evaluate a letter in which

---

[12] Those impressions include: (1) on December 21, 2009: "she really has not been able to work due to her depression," Tr. 288; (2) on August 17, 2010: "I do not feel she can work in the states she has been in the last few years," Tr. 398; (3) on September 27, 2010: "I feel that she is in no shape to work and is not . . . able to hold a job," Tr. 396; and (4) on February 4, 2011: "due to her severe . . . agoraphobia I do not feel she is in any condition to work at this time and for the next year or two until she has a good course of behavioral therapy," Tr. 394.

McQuaid was awarded Medicaid benefits; and (3) did not address or evaluate various factors mentioned in Dr. Hanrahan's letter. After stating that "further development of the record and evaluation are needed regarding the claimant's medically determinable impairments," Tr. 81, the Appeals Council concluded its order by directing the ALJ to:

> [o]btain additional evidence concerning the claimant's impairments in order to complete the administrative record in accordance with the regulatory standards regarding consultative examinations and existing medical evidence . . .;
>
> [f]urther evaluate the nature and severity of the claimant's medically determinable impairments of record, including the pain and arthritic changes in her right hand [and] [d]etermine if they have more than a minimal effect on the claimant's ability to work or if they significantly limit the claimant's ability to perform basic work activities . . .;
>
> [f]urther evaluate the claimant's mental impairments in accordance with the special technique described in 20 CFR 404.1520a and 416.920a, documenting application of the technique in the decision. . .; and
>
> [f]urther evaluate the claimant's subjective complaints . . . .

Tr. 81.  With regard to obtaining additional evidence, the Appeals Council said: "The additional evidence may include, as warranted and available, a consultative examination with psychological testing and medical source statements about what the claimant can still do despite her impairments." Id.

    After the case was remanded, McQuaid's attorney obtained a

Medical Source Statement from James Samson, a physical
therapist, who examined McQuaid and performed a variety of
tests.  "[T]he purpose of the testing [was] to document
[McQuaid's] abilities and potential for physical activities in
areas such as sitting, standing, walking, reaching, grasping,
fine fingering, lifting, pushing, pulling, bending, stooping and
squatting."  Tr. 406.  Samson noted the following diagnoses: low
back pain, right thumb pain, left ankle pain, chronic headaches,
agoraphobia, and depression.  Based upon his testing, Samson
determined that McQuaid could work 40 hours a week, but also
opined that, as a result of her impairments, she would have to
miss more than four days of work per month.

McQuaid received a second hearing before the ALJ.  After
that hearing, the ALJ issued a decision that includes the
following relevant findings of fact and conclusions of law:

> 3.  The claimant has the combination of medically
> determinable impairments consisting of abdominal pain,
> affective disorder and anxiety disorder (20 CFR
> 404.1521 et seq. and 416.921 et seq.).
>
> . . . .
>
> 4.  The claimant does not have an impairment or
> combination of impairments that has significantly
> limited (or is expected to significantly limit) the
> ability to perform basic work-related activities for
> 12 consecutive months; therefore, the claimant does
> not have a severe impairment or combination of
> impairments (20 CFR 404.1521 et seq. and 416.921 et
> seq.).

Tr. 20, 21.

### III. Discussion

A. <u>The Legal Framework</u>

To be eligible for disability insurance benefits, a person must: (1) be insured for such benefits; (2) not have reached retirement age; (3) have filed an application; and (4) be under a disability. 42 U.S.C. §§ 423(a)(1)(A)-(D). To be eligible for supplemental security income, a person must be aged, blind, or disabled, and must meet certain requirements pertaining to income and assets. 42 U.S.C. § 1382(a). The question in this case is whether McQuaid was under a disability from December 1, 2008, through September 17, 2013, the date of the ALJ's decision.

To decide whether a claimant is disabled for the purpose of determining eligibility for either DIB or SSI benefits, an ALJ is required to employ a five-step process. <u>See</u> 20 C.F.R. §§ 404.1520 (DIB) & 416.920 (SSI).

> The steps are: 1) if the [claimant] is engaged in substantial gainful work activity, the application is denied; 2) if the [claimant] does not have, or has not had within the relevant time period, a severe impairment or combination of impairments, the application is denied; 3) if the impairment meets the conditions for one of the "listed" impairments in the Social Security regulations, then the application is granted; 4) if the [claimant's] "residual functional capacity" is such that he or she can still perform past relevant work, then the application is denied; 5) if the [claimant], given his or her residual

12

> functional capacity, education, work experience, and
> age, is unable to do any other work, the application
> is granted.

Seavey v. Barnhart, 276 F.3d 1, 5 (1st Cir. 2001) (citing 20

C.F.R. § 416.920).

The claimant bears the burden of proving that she is

disabled.  See Bowen v. Yuckert, 482 U.S. 137, 146 (1987).  She

must do so by a preponderance of the evidence.  See Mandziej v.

Chater, 944 F. Supp. 121, 129 (D.N.H. 1996) (citing Paone v.

Schweiker, 530 F. Supp. 808, 810-11 (D. Mass. 1982)).

B. McQuaid's Claims

McQuaid claims that the ALJ's step-two determination, i.e.,

that she did not have a severe impairment at any point before

the date of his decision, is not supported by substantial

evidence.  The Acting Commissioner disagrees.  The court begins

by describing the relevant legal principles and then considers,

in turn, the ALJ's determinations that McQuaid did not have

either a severe mental or physical impairment.

1. Legal Principles

The applicable regulations provide that a claimant who does

not have a severe impairment of sufficient duration is not

disabled.  See 20 C.F.R. §§ 404.1520(a)(4)(ii) &

416.920(a)(4)(ii).  More specifically, "[i]f [a claimant] do[es]

not have any impairment . . . which significantly limits [his]

13

physical or mental ability to do basic work activities, [the Acting Commissioner] will find that [the claimant] do[es] not have a severe impairment and [is], therefore, not disabled." 20 C.F.R. § 404.1520(c); see also § 416.920(c). "An impairment . . . is not severe if it does not significantly limit [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1421(a); see also § 416.921(a).

In this circuit, it is well established "that the Step 2 severity requirement is . . . to be a de minimis policy, designed to do no more than screen out groundless claims." McDonald v. Sec'y of Health & Human Servs., 795 F.2d 1118, 1124 (1st Cir. 1986). Under Social Security Ruling ("SSR") 85-28, "a finding of 'non-severe' is only to be made where 'medical evidence establishes only a slight abnormality or combination of slight abnormalities which would have no more than a minimal effect on an individual's ability to work.'" McDonald, 795 F.2d at 1124 (quoting SSR 85-28, 1985 WL 56856, at *3 (S.S.A. 1985)). Thus, a proper analysis at step two should "do no 'more than allow the [Acting Commissioner] to deny benefits summarily to those applicants with impairments of a minimal nature which could never prevent a person from working.'" Id. at 1125 (quoting Baeder v. Heckler, 768 F.2d 547, 553 (3d Cir. 1985)) (emphasis added).

14

To move her claim past step two in the sequential analysis, McQuaid must prove, by a preponderance of the evidence, that her impairments were not so minimal that they could never prevent a person from working.  See Bowen, 482 U.S. at 146; Mandziej, 944 F. Supp. at 129.  On the other hand, the ALJ's step-two determination must be affirmed if it is based on evidence that a reasonable mind might accept as adequate to support it.  See Currier, 612 F.2d at 597.

2. Mental Impairments

The ALJ determined that McQuaid did not suffer from any severe mental impairment by: (1) concurring with Dr. Martin's opinion; (2) giving little weight to Dr. Hanrahan's letter of September, 2010; (3) giving no weight to Dr. Hanrahan's Medical Source Statement of October, 2010; and (4) repeating, almost verbatim, the analysis he used in his previous decision with respect to 20 C.F.R. §§ 404.1520a & 416.920a.  See Tr. 25–26, 74.[13]  McQuaid argues that the ALJ's step-two determination is

---

[13] There is only one actual difference between the two analyses.  In his first decision, the ALJ wrote: "While the May 2010 consultative mental health evaluation documents no significant limitations [on] understanding and remembering instructions, the claimant complained that anxiety interfered with her ability to focus on and complete tasks."  Tr. 74.  In his second decision, the ALJ wrote: "While the claimant complained that anxiety interfered with her ability to focus on and complete tasks, the May 2010 consultative mental health evaluation documents no significant limitation with understanding and remembering instructions."  Tr. 26.

not supported by substantial evidence because: (1) Dr. Martin's
opinion was based upon an incomplete record, i.e., a record that
did not include Dr. Hanrahan's opinion; and (2) Dr. Martin
misinterpreted Dr. Burnette's evaluation.  The Acting
Commissioner disagrees.

There are several problems with the ALJ's determination
that McQuaid's anxiety and depression were not severe
impairments.  As noted, the ALJ relied upon the opinion of Dr.
Martin, who relied upon Dr. Burnette's evaluation.  In his
decision, the ALJ said:

> Dr. Burnette noted that the claimant was only
> medically managed with the medication Prozac, and that
> the claimant feels that it helps moderately well with
> her depressive symptoms.

Tr. 23.  While Dr. Burnette reported that McQuaid
"acknowledge[d] that her Prozac prescription [had] been very
helpful in managing her depression," Tr. 345, he also said this:

> She describes persistent and long-standing symptoms of
> anxiety which she does not feel [have] been noticeably
> ameliorated by the Prozac.  She takes diazepam 5 mg.
> [by mouth, three times a day] with minor efficacy but
> she feels that her years of taking benzodiazepine-
> class drugs has reduced her response to them.  She
> states that she experienced her first "panic attack"
> approximately "22 years ago" . . . .  These episodes
> have come and gone in the intervening years and she
> had been treated with Xanax and Klonopin in the past .
> . . .  Even with her diazepam now, she said that she
> experienced four or five panic-like episodes in the
> past month.
>
> . . . .

16

> According to this claimant's medication bottles (from which she read), Ms. McQuaid currently takes Prozac 60 mg. [by mouth, once a] day (which had recently been increased) and diazepam 5 mg. [by mouth] "up to three times a day" . . . .  These are prescribed by Melissa B. Hanrahan, M.D.  She felt that the Prozac helps moderately well with her depressive symptoms, but she reports considerable spill-over anxiety in spite of the diazepam.

Tr. 345, 346.

So, here is where things stand.  McQuaid's medical records document the use of 10 different medications to treat two different mental impairments, anxiety and depression.  Dr. Burnette's evaluation mentions four of the 10 medications, Prozac, Xanax, diazepam, and Klonopin, and both of the impairments for which those medications were prescribed.  Yet, the ALJ interpreted Dr. Burnette's evaluation to say that McQuaid had been treated only with Prozac for depression.  Obviously, for the purpose of ascertaining severity at step two, a patient with a single impairment that is well controlled with a single medication is in a substantially different position than a patient with two impairments, one of which has not been well controlled despite the use of many different medications.  In short, the ALJ's characterization of Dr. Burnette's evaluation, which was the basis for the medical opinion on which the ALJ relied, is not supported by substantial evidence.

In addition to understating the findings in a medical

evaluation that itself understated the actual medical record, the ALJ also independently understated the medical record.  In his discussion of Dr. Hanrahan's letter, to which he gave little weight, the ALJ said:

> The claimant reported difficulty leaving her house;
> but Dr. Hanrahan's notes do not reflect any difficulty
> attending appointments with her . . . .

Tr. 24.  Dr. Hanrahan's notes, however, include these comments: (1) on April 23, 2010, "having to double valium to get out of the house," Tr. 399; (2) on August 17, 2010: "she can barely make it to appointments here," Tr. 373; and (3) on January 30, 2012: "had a shot of whiskey to get out of the house today," Tr. 385.  Thus, the ALJ's statement about Dr. Hanrahan's notes is not supported by substantial evidence.

Turning to the remand order, the Appeals Council directed the ALJ to obtain additional evidence concerning McQuaid's impairments including, if warranted, "a consultative examination with psychological testing."  Tr. 81.  The ALJ does not appear to have obtained any additional evidence.  Given that Dr. Burnette's consultative examination pre-dates Dr. Hanrahan's opinions, and does not appear to include a consideration of her treatment records, it is difficult to see how a new consultative examination is not warranted in this case.  That conclusion is reinforced by the lack of any indication in the medical records

that McQuaid's mental condition is improving, and by Dr.
Burnette's observations that McQuaid's mental health appeared to
be worsening.  See Tr. 344 (noting McQuaid's reports of
escalating symptoms of depression); 347 (noting McQuaid's
reports of increasing anxiety); 348 (stating: "this claimant's
growing anxiety about dealing with people and the public was a
major contributor to her leaving her profession as a waitress"
(emphasis added)).  The Appeals Council also directed the ALJ to
"[f]urther evaluate the claimant's mental impairments in
accordance with the special technique described in 20 CFR
404.1520a and 416.920a."  Tr. 81 (emphasis added).  That
directive indicates that the evaluation in the ALJ's first
decision was insufficient and, presumably, was based upon the
directive to obtain additional evidence.  Yet, the further
evaluation in the ALJ's second decision consists of nothing more
than a retyping of the evaluation from his first decision.

     In sum, the primary focus of the ALJ's second decision
seems to be mounting a defense of his first decision, rather
than the record development and further evaluation mandated by
the Appeals Council.  The bottom line is this.  Step two is a
minor hurdle, see McDonald, 795 F.2d at 1124, and the court
cannot endorse the ALJ's determination that the medical evidence
establishes that McQuaid's depression and anxiety, which have

been treated for several years with no fewer than 10 different medications, constitute "a slight abnormality," id., that "could never prevent a person from working," id. at 1125.  Accordingly, the case must be remanded yet again.

### 3. Physical Impairments

While this case must be remanded as a result of the ALJ's erroneous determination that McQuaid's mental impairments did not meet the step-two severity requirement, the court turns, briefly, to the ALJ's treatment of McQuaid's physical impairments.  The ALJ determined that McQuaid did not suffer from any severe physical impairment by: (1) determining that she did not have a medically determinable impairment of her hand; (2) concurring with Dr. Jaffe's opinion that her abdominal pain was not a severe impairment; and (3) giving no weight to the opinion from James Samson.

With respect to the hand impairment, the Appeals Council directed the ALJ to "[f]urther evaluate the nature and severity of the claimant's medically determinable impairments of record, including the pain and arthritic changes in her right hand." Tr. 81 (emphasis added).  In other words, the Appeals Council identified McQuaid's hand pain and arthritic changes as medically determinable impairments.  Rather than further evaluating the nature and severity of those impairments, as

directed by the Appeals Council, the ALJ determined that "[t]he claimant has no medically determined hand condition."  Tr. 21. That was error.

On February 4, 2011, McQuaid complained to Dr. Hanrahan of "R hand pain, middle finger pain."  Tr. 369.  Dr. Hanrahan, in turn, diagnosed McQuaid with right hand pain, and further elaborated: "It looks like she has some arthritic changes in her right thumb."  Tr. 370.  Dr. Hanrahan then recommended treatment: "she can use Tylenol No. 3 as needed."  Id.  Thus, the Appeals Council determined that McQuaid's hand condition was medically determined, and McQuaid's treatment records demonstrate that her hand condition was medically determined. Whether that impairment was severe is another question; for the moment it is sufficient to note that the ALJ erred in re-determining that McQuaid's hand condition was not medically determined.

There is another problem with the ALJ's handling of McQuaid's physical impairments.  After the ALJ decided to give no weight to James Samson's opinion, the only medical evidence before him concerning McQuaid's physical condition was Dr. Jaffe's opinion, which was rendered before McQuaid was diagnosed with arthritic changes to her right hand.  Thus, the ALJ made his step-two determination without the benefit of any medical

21

opinion concerning the limiting effects of McQuaid's hand condition, notwithstanding the Appeals Council's instructions to: (1) evaluate the nature and severity of McQuaid's hand condition; and (2) obtain additional evidence.   This deficiency should be remedied on remand.

## IV. Conclusion

For the reasons given, the Acting Commissioner's motion for an order affirming her decision, document no. 7, is denied, and McQuaid's motion to reverse that decision, document no. 5, is granted to the extent that the case is necessarily remanded to the Acting Commissioner for further proceedings, pursuant to sentence four of 42 U.S.C. § 405(g).   The clerk of the court shall enter judgment in accordance with this order and close the case.

**SO ORDERED.**

_____
Steven McAuliffe
United States District Judge

November 2, 2015

cc:   Peter K. Marsh, Esq.
      Robert J. Rabuck, Esq.